BUTLER ET AL.

*v.*

TOPKIS ET AL.

(Court of Chancery of Delaware.   March 8, 1906.)

   *Harry Emmons* and *Anthony Higgins,* for complainants.   *Harry P. Joslyn* and *William S. Hilles,* for respondents.

NICHOLSON, Chancellor: The bill in this cause was filed by the complainants, lessees of the late Mrs. Margaret Jones Tinges, trustee under the will of Margaret Ross Jones, deceased, to restrain William Topkis and Charles Topkis, two of the respondents, from proceeding further in a certain suit instituted by them before a justice of the peace against the said complainants, and James P. and James G. Laskaris, for an alleged holding over after notice to quit of a certain lot, with a brick building thereon erected, situated on the easterly side of Market Street, below Fifth, in the city of Wilmington. The said William Topkis and Charles Topkis have demurred to the bill, and therefore the questions involved, which are very interesting, are presented free from the embarrassment of conflicting testimony and troublesome issues of fact. It appears that this property came to Mrs. Tinges under the will of the late Margaret Ross Jones, who died in 1890. Item 6 of the will provides as follows: "All the rest, residue and remainder of my estate of whatever kind, real, personal or mixed, and wheresoever the same may be at the time of my decease I give, devise and bequeath unto my niece Margaret Jones Tinges (wife of A. H. Tinges), her heirs, executors, administrators and assigns, in trust nevertheless, whenever she shall think fit during her lifetime, after reasonable public notice, to sell and dispose of the real estate at public or private sale for the best price that can be obtained therefor * * * and in the meantime until such sale, in trust to collect the income therefrom, and after paying the taxes and expenses in maintaining and keeping up such real estate, the overplus to take and apply to her own uses and purposes." After providing for the disposition of the proceeds of the sale, the will provides further: "And in case she shall fail to execute the said trust and sell and dispose of the said real estate in accordance with the foregoing provision during her lifetime, then, in revocation of said trust from thenceforth the said real estate to go to the said Security Trust & Safe Deposit Company and its successors in fee simple in trust to sell and dispose of the same in manner and form and with like powers and like duties and obligations as hereinbefore provided in regard to the disposal of the same by the aforesaid Margaret Jones Tinges." And, finally, item eight provides as follows: "In case my real estate should not be disposed of by Margaret Jones Tinges dur-

ing her lifetime but should afterwards be sold or disposed of by the said Security Trust & Safe Deposit Company under the trust therein reposed in them, then the net proceeds of the said sale shall be paid over by them, the said trust company, to the children or issue of the said Margaret Jones Tinges, of Leroy Webster, of Samuel G. Patterson, and of Amelia Patterson Webster, in the same share and proportion and subject to the same qualifications as hereinbefore provided for in item six of this will in relation to the other personalty coming into the hands of the said trust company."

The bill further alleges, in paragraph 3, "that the said Margaret Jones Tinges named as trustee in the aforesaid will of the said Margaret Ross Jones, survived the said testatrix, and during her lifetime acted as trustee under the provisions of said will; that sometime before the 11th day of March, 1892, the said Margaret Jones Tinges, entered into negotiations with the said E. S. R. Butler & Son for the sale of said above-described premises but that owing to a flaw in the title to said premises the said sale was not made but in lieu of making said sale, and in order to raise an income for herself and to carry out the purpose of said will, the said Margaret Jones Tinges made a lease of said premises, unto the said E. S. R. Butler & Son, in the following terms, to wit: [Then follows the lease set forth at length.]" This lease was for a term of 15 years commencing on the 25th day of March, 1892, and ending on the 25th day of March, 1907, for the net rental of $650 per annum, payable in quarterly installments; the lessee to pay all taxes, insurance, and water rent and to do all repairs, etc., so that the lessor might receive the said sum of $650 as net rent. It also appears from the bill (paragraph 4) "that about the time of making said lease there was upon said premises an old dilapidated frame building which had become almost untenantable, and it had become necessary to replace said building with a new and modern structure; that the said Margaret Jones Tinges was unable and unwilling to be at the whole expense of erecting said new building, and the said E. S. R. Butler & Son in part consideration for the said lease, agreed with the said Mrs. Tinges to share with her the expense of erecting a new building upon said premises; that accordingly the old building was torn down and a new building

erected at a cost to the said E. S. R. Butler & Son of about one thousand dollars outside of the considerations named in said lease."

Mrs. Tinges, the trustee, died June 6, 1898, in her thirty-ninth year, with nearly nine years of the lease still to run, and the Security Trust & Safe Deposit Company thereupon assumed the duties of trustee and from that time on continued to receive the rents as they fell due under the above-described lease for about six years until the 25th day of December, 1904, at which time the property had been conveyed to the said William and Charles Topkis by deed dated December 23, 1904, it having been sold to them at public sale on the 27th day of June, 1904. It is not explained how the flaw in the title was disposed of. It also appears that prior to this public sale, the said William and Charles Topkis, the purchasers, had full notice and knowledge of the above-described lease. August 17, 1904, the said E. S. R. Butler & Son sublet the property to the said James P. and James G. Laskaris for the balance of their term, and have made them defendants in this bill because of their refusal to join with them as complainants. The said purchasers, William and Charles Topkis, immediately after receiving the deed of the property gave notice in writing to the complainants, and also to the said James P. and James G. Laskaris, who are now in possession of the property, to vacate and give up possession by March 25, 1905, and subsequently commenced summary proceedings against them under the provisions of the statute for tenants holding over after notice to quit before Alton C. Pyle, one of the justices of the peace for New Castle county. A restraining order was granted upon the filing of the bill and a demurrer was filed on the 8th of May, 1905, which was argued in due course, and subsequently a supplementary brief was filed by Mr. Higgins one of the solicitors for the complainant.

It is contended by respondents that the express power of sale contained in the will did not include the power to lease, and that therefore Mrs. Tinges, the trustee, had no power to make a lease extending beyond her beneficial life estate although she had the whole legal estate. The language of the solicitor's brief on this point being, "If she could lease the lands for 15 years, there is no

reason in law why she might not lease it for a thousand years or any other term. Her grantee could manifestly take nothing more under any grant from her than she herself had." The solicitors for complainant freely admit this proposition and accept the authorities cited by respondent's solicitor to show that there is no defense at law to the suit before the justice, but they contend that it is for the very reason that the rights of the lessees are not cognizable elsewhere than in a court of equity that they have a standing in this court. Much has been said in the argument in respect to the nature of summary possessory proceedings before a justice of the peace, and upon the question whether there is jurisdiction in this court to restrain proceedings under the statute for holding over or forcible entry and detainer, but I can see no ground upon which such proceedings can be excepted from the general rules governing the relation of courts of equity to legal proceedings in general. Nor is this a new question in the Court of Chancery of Delaware. A preliminary injunction was granted by Chancellor Bates in the case of *Marvel v. Ortlip et al.,* 3 *Del.Ch.* 10, etc., to restrain proceedings under the landlord and tenant act against a tenant holding over after notice to quit. And upon this point of jurisdiction Mr. Bayard, counsel for the complainant, said in his argument: "With respect to the objections taken to the jurisdiction to interfere, the injunction operated not on the justice or his jurisdiction, nor does it assume his jurisdiction. It acts on the parties in view of equitable circumstances affecting their right to avail themselves of his jurisdiction. Eden on Inj. 4." Speaking further of the remedy by injunction he said: "It applies to all legal proceedings and acts against which equity exists."

The hearing in the case of *Marvel v. Ortlip* was on a motion to dissolve the preliminary injunction, and was decided against complainants upon the merits, testimony having been taken for the purposes of the motion. With respect to the question of jurisdiction, however, the Chancellor took occasion to speak as follows: "The defendant's answer, and his counsel in argument, took several objections to the equity of the bill which did not go to the merits of the case. These were, * * * and also that the issuing of an injunc-

tion in such a case was an infringment of a jurisdiction exclusively conferred upon the justice of the peace, and, * * * Having been obliged to decide the motion against the complainant on the merits, these questions were properly discussed; but it is not necessary for me to examine them, and I will express no opinion on them, further than to say that they would not prevent me from ordering an injunction again under like circumstances." This dictum carries the more weight because of the well-known caution and painstaking accuracy of expression which always distinguished the learned Chancellor—a Chancellor regarded by the whole bar as one of the most learned and industrious equity lawyers that ever adorned the bench of this state. The grounds upon which Chancellor Bates assumed the jurisdiction to grant the injunction in that case are sufficiently obvious to render it unnecessary for me to discuss further this question of jurisdiction, governed as it is by principles of equity which are so familiar. It is enough to have quoted the remarks of Mr. Bayard as above, and the dictum of the Chancellor.

With this question of jurisdiction disposed of, it only remains to consider whether a case is presented which possesses the special features that demand equitable relief, for as above stated, complainants' solicitors aggressively admit that they have no standing in a court of law, and it is only for the reason that the rights of the lessees are not cognizable elsewhere than in a court of equity that they have applied to this court for relief. They quote from Pomroy's Equity Jurisprudence, vol. 2, § 1361, the proposition that "equity will not restrain a legal action or judgment when the controversy would be decided by the court of equity upon a ground equally available at law unless the party invoking the aid of equity can show some special equitable features or ground of relief." And they cite the cases usually cited upon this subject. The cases cited in support of their claims are for the most part those in which trustees with similar powers have applied under similar circumstances to a court of equity for authority to make leases extending beyond the life of the trust. In *Gomez v. Gomez,* 81 *Hun.* 566, 31 *N.Y.Supp.* 206, decided in 1894, and afterwards affirmed by the New York Court of Appeals, 147 *N.Y.* 195, 41 *N.E.* 420, a case sustaining the validity of such a decree,

the lease being a building lease providing for renewals and the question being presented on a demand for renewal, Justice Parker said: "Whether the Court of Chancery which made the decree had power to authorize the lessors to covenant for the giving of renewal leases for a period which it was certain would extend beyond the life of the trust presents a different question. That such a power should rarely if ever be exercised will be readily assented to. That the authority resided in the Court of Chancery to direct trustees generally as to the manner in which they should discharge the duties resting upon them as such, in the absence of specific instructions in the trust instrument, has always been recognized. Indeed, it constitutes one of the acknowledged heads of equitable jurisdiction. The deed of trust in question did not expressly confer upon the trustees authority to make leases, and the object of the suit instituted by Hetty Gomez and her husband was to obtain an adjudication as to the rights of the trustees to make leases and renewals of leases for terms of years." Judge Barrett, concurring, said (page 576 of 81 *Hun.*, page 212 of 31 *N.Y.Supp.*) : "In my judgment the Court of Chancery had jurisdiction to make the decree in question. Whether such decree was proper, under the circumstances, was a question which that court had power to decide. Were it otherwise, a court of equity could not, under any circumstances, however pressing, authorize a lease to run after the death of the life beneficiary. Equity is not thus limited. It may act upon a state of facts which would not suffice to warrant the trustee in acting without its authority. To do so may be as essential for the protection and benefit of the remainderman as of the life tenant. And, in so acting, it is within its general jurisdiction." In Illinois this jurisdiction of a court of equity has been affirmed in a number of cases. In *Marsh v. Reed,* 184 Ill. 263, 56 *N.E.* 306 (1900), the trustees had power to lease but the power was expressly limited by the will to 10 years, and yet the court authorized the making of a building lease for 99 years, which provided for the building of a large hotel at a greatly increased rental. The court says, on page 273 of 184 *Ill.,* page 310 of 56 *N.E.:* "The equitable principle applicable where the directions of a donor as to the matter of executing a trust are found to be defective and unwise is well stated in *Curtiss v. Brown, 29 Ill.* 201, as follows (page 230) :

'Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of a court of chancery must be invoked to grant relief imperatively required; and in such cases the court must, as far as may be, occupy the place of the party creating the trust, and do with the fund what he would have dictated had he anticipated the emergency.' "

I cite these late cases from Illinois and New York as typical modern American decisions, and I find none contra. For authority in this state, however, we would rather look to the English decisions and to utterances of Chancellor Kent, the great American Chancellor who showed the way to adapt the principles and precedents of the English court of chancery to the conditions existing in this young republic, and developed them symmetrically in the adaptation. He has left us a relevant opinion in *Hedges v. Riker, 5 Johns.Ch. (N.Y.)* 163. In that case the testatrix bequeathed and devised to her executors in trust for the use and behoof of her only child, the plaintiff, Mrs. Hedges, the whole income, rents, etc., of her property real and personal during her natural life, for her use and that of her children, and after her death to her children; and if she should die without issue, then the remainder over to be distributed according to the directions of the will, and gave to her executors "full power and authority to sell and dispose of so much of the real estate as may be necessary to fulfill the will." The bill made the contingent remaindermen defendants and stated that a considerable portion of the estate consisted of vacant lots in the city of New York which the plaintiff and her husband were not in circumstances to improve. That she had infant children living and prayed that the executors might be enabled to make building leases for 21 years with provision for renewal, etc. Chancellor Kent, after commenting on the terms of the will and the effect of the words "dispose of," said: "A lease for years is still a disposition of the estate, within the terms of the power; and without resorting to the power, the general jurisdiction of the court, over the property of infants, is adequate to confer the authority. The court stands, as Lord Nottingham observed, in loco parentis: and it is understood to be clearly settled (*Mills v. Dennis, 3 Johns.Ch. 370*), that

the court may change the estate of infants from real into personal, and from personal into real, whenever it deems such a proceeding most beneficial to the infant. It was declared by the Lords Commissioners, in *Cecil v. Earl of Salisbury*, (2 *Verm.* 224) that the court had often decreed building leases, for 60 years' of infants' estates, when for their benefit."

The English Court of Chancery has regularly exercised this jurisdiction and the only cases which are cited contra by the solicitors for the respondent or elsewhere appear upon examination to be not inconsistent with it. The first is that of *Wood v. Patteson*, 10 *Beavan*, 541. The testator in that case was seised of some mining property under lease for 99 years, which lease expired sometime before the suit was brought before the Master of the Rolls praying liberty for the trustees under the will to grant a lease for 60 years, the testator having given his trustees no power to lease the property. The case was well argued, apparently, and the Master of the Rolls, Lord Langdale, referred it to the master to inquire whether such a lease was necessary and proper, and for the benefit of the parties in remainder who were infants. The master reported favorably, but finally the order was refused without reasons being given. In the course of the argument, however, immediately after the citation of the case of *Newton v. Lucas* in which a building or repairing lease for 60 years had been authorized the Master of the Rolls said, "This matter requires great consideration. There is a considerable difference between a building and a mining lease; in the former case, an addition is made to the estate, but in the latter the whole is an abstraction, and I am at a loss to see what authority this court has to permit the tenant for life to take the substance of the estate, which would otherwise be inherited by the remainderman." Manifestly this reasoning controlled Lord Langdale's decision and was the reason for his saying afterward, "as to *Newton v. Lucas*, I do not think myself bound by it." In the case of *In re Shaw's Trust*, 12 *L.R. Eq.* 123 (1871), Vice Chancellor Wickens refuses to allow trustees to grant leases generally for 10 years and repudiates *Naylor v. Arnitt*, 1 *Russ. & My.* 501, where the court held that the trustees under the will which was considered, had the power to grant leases generally for 10 years. The case of

*Naylor v. Arnitt* was also questioned by Lord Langdale in the case above cited, *Wood v. Patteson,* which is cited by Vice Chancellor Wickens. It is to be noted that in neither *Naylor v. Arnitt* nor in *Re Shaw's Trust* were any reasons or circumstances given to justify the giving of the leases in question. In *Evans v. Jackson,* 8 *Sim.* 217, there was an expressed power of sale but no power to lease, and Vice Chancellor Shadwell interrupted the argument to say, "the will contains, on the face of it, an express trust that the executors shall sell the house; and, prima facie, that is inconsistent with the granting a lease. It is true that there might be circumstances to justify the executors in departing from the words of the trust. But the record is not so constructed as to enable me to enter into the consideration of those circumstances; for the cestuis que trust are not parties, and, in their absence, I cannot enter into consideration of the particulars which might tend to show that the executors were justified in agreeing to grant the lease." In consequence, therefore, of this oversight of counsel, in omitting necessary parties defendant, the bill was dismissed, but without costs. This case is peculiarly interesting in that Shadwell, V.C., speaks of looking into the particular circumstances of the lease in order to determine its validity, as a principle of decision, common and familiar as hornbook law.

If, in the light of these authorities, we examine the circumstances in the present case as they are alleged in the bill and admitted by the demurrer it becomes plain that if Mrs. Tinges, instead of making the lease on her own responsibility as trustee, had filed a bill properly alleging the facts and praying this court to authorize her to make just such a lease as the one she did make, and on the same terms as are set out in the present bill, then this court would have felt compelled by the precedents and principles which I have cited to grant the authority; and the lease would have been executed with the sanction of the Court of Chancery in the exercise of a jurisdiction which has been established beyond question. The case of *Attorney General v. Kerr,* 2 *Beavan,* 421 heard in 1840, by Lord Langdale, concerned a charitable trust in which there was no power of alienation, but the trustee, the corporation of Northampton, undertook to act on its own responsibility in granting leases of real estate and rever-

sionary leases and finally an absolute conveyance. An information was filed to set the conveyance aside and it was so ordered by Lord Langdale on the ground that both the reversionary lease and the conveyance were improvident. In the course of his opinion he said: "It has been truly said that, when a considerable benefit would be gained to a charity, the court itself would order an alienation of charity property; and from this it is argued that on clear and decided evidence of its being manifestly for the benefit of the charity, a trustee might be justified in doing that which under similar circumstances the court itself would do; such cases have certainly from time to time been put, but this is not one of such cases. I apprehend that there can be no doubt whatever in any ordinary mind, that the last transaction here complained of must be set aside." There are other cases relating to charitable trusts which might be still more instructive in this connection, but it may be urged that in the case of charitable trusts the trust is permanent, and that therefore the rules applying to them must differ in important particulars from those applicable to such trusts as we are considering, which concern primarily a beneficial life interest.

The question before us in this case, however, does not involve the consideration or analysis of legal titles, or estates, or their incidents. The legal title of the lessees is not in dispute for it is admitted to be defective, but it appears from the cases I have cited that the lease in question is not contrary to law, for a lease contrary to law cannot be authorized by a court of equity. The point to be decided in this case is: "Does not an equity exist, arising from all the circumstances as well as the nature of the trust, against the proceedings which have been instituted before a justice of the peace to obtain the possession of the leased property now instead of March 25, 1907, the end of the term?". No case directly in point has been cited or found by me, but the books abound in analogies and the more extensively the general subject of the management of trust estates is examined, the more plainly and clearly does it appear that such a lease as this cannot escape from the jurisdiction of the Court of Chancery. When the proper and regular course is taken in such cases, all the questions involved are considered and decided, or are supposed to be, on bill filed by the trustees praying to be authorized to make the lease. But

if on the other hand, the trustee recklessly acts upon his own responsibility and finds some one sufficiently optimistic or ignorant of the law to become lessee and to make valuable permanent improvements at his own expense upon the faith of a lease for a term of years sufficiently long for him to be compensated for his original outlay, then it would seem that precisely the same questions would necessarily arise on an application to set the lease aside. Or, if adverse legal proceedings be taken to obtain possession, notwithstanding the lease, as in this case, then the same questions must be considered on the bill filed to enjoin the further prosecution of such proceedings as being against equity and good conscience. In the latter cases, of course, new circumstances may have arisen affecting the original question, such as the advent of innocent purchasers or acts upon which the claim of an estoppel may be based. In fact, complainant's solicitors contend as an additional ground for relief in the present case that the remaindermen or ultimate beneficiaries in whose place the said William and Charles Topkis, the respondents, stand, are estopped to attack the lease by reason of the receipt of rent under it in their behalf by the Security Trust & Safe Deposit Company for nearly six years after the death of Mrs. Tinges.

It is admitted that the said respondents are not innocent purchasers, and that having purchased the property with knowledge and notice of the lease, they stand in the shoes of the remaindermen or ultimate beneficiaries of the trust. But, whatever may be the force of their claim of estoppel, I do not deem it necessary to enter into the discussion of it, because the facts, and circumstances which I have already set forth at length and the authorities which I have cited have led me, independently of that, to the conclusion that the complainants in this cause have by their bill made such a case as entitles them to relief, and that therefore the demurrer must be overruled.